Barbara HANDSCHU, et al., Plaintiffs,

v.

**POLICE DEPARTMENT OF THE CITY OF NEW YORK, et al., Defendants.**

No. 71 Civ. 2203 (CSH)

United States District Court, S.D. New York.

Signed 03/13/2017

Paul Chevigny, Jethro M. Eisenstein, Profeta & Eisenstein, Martin R. Stolar, Franklin Siegel, Arthur Eisenberg, New York Civil Liberties Union, New York, NY, for Plaintiff Class.

Zachary Carter, Corporation Counsel, Peter Gerard Farrell, Deputy Chief, New York City Office of Corporation Counsel, New York, NY, for Defendants.

### RULING AND ORDER ON PROPOSED REVISED SETTLEMENT AGREEMENT

HAIGHT, Senior District Judge:

In this civil rights class action, the Court is required for the second time to approve or disapprove a proposed settlement between the plaintiff Class and the City of New York regarding important issues affecting the City's Muslim community.

The settlement agreement now before the Court is a revision of the initial settlement proposal that the Court declined to approve for the reasons stated in a Ruling reported at 2016 WL 7048839, signed on October 28, 2016 (the "October Ruling"), familiarity with which is assumed. The October Ruling declined to approve what I will refer to herein as the "Initial Settlement Agreement." Thereafter, counsel for the parties conducted further negotiations. The parties eventually agreed upon a revised proposal (the "Revised Settlement Agreement"). The parties submitted the Revised Settlement Agreement to the Clerk for filing on March 6, 2017, and jointly request that the Court approve it.[1]

For the reasons that follow, the Court approves the Revised Settlement Agreement.

## I

Understanding a district judge's duties and responsibilities in evaluating the proposed settlement of a class action begins with Rule 23 of the Federal Rules of Civil Procedure, which creates and governs class actions in the federal courts. Rule 23(e) provides: "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The court must give notice "to all class members who would be bound by the proposal," Fed. R. Civ. P. 23(e)(1), and "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate," id. 23(e)(2).

The Rule does not undertake to define the adjectives "fair, reasonable, and adequate," and given the infinite complexities of the human spirit and the disputes it is capable of generating, that is understandable: the application of so broadly stated *desiderata* to a particular settlement in a particular case is necessarily fact specific. Nevertheless, the Second Circuit's series of decisions, reviewing for abuse of discretion a district court's approval or disapproval of a class action settlement, furnish-

---

1. Although the parties presented the Revised Settlement Agreement to the Clerk for filing on March 6, 2017, the actual date the document appeared as filed on the case docket was March 9, 2017. *See* Doc. 470.

es guidance on the practical meaning of these salutary objectives.

One of those decisions was rendered at an earlier stage of this case. In *Handschu v. Special Services Division*, 787 F.2d 828 (2d Cir. 1986), the Second Circuit affirmed this Court's approval of a settlement jointly proposed by the Class and the City that included the initial Handschu Guidelines. I conducted a lengthy fairness hearing at which a number of individuals and entities, represented by counsel or appearing *pro se*, objected to the proposal on one ground or another, and pressed their objections to the settlement on appeal following this Court's approval of it. Judge Van Graafeiland's opinion for the court of appeals focused upon the necessity of showing that "the settlement agreement was fair and reasonable," 787 F.2d at 833, and expressed the view that the trial judge "knows the litigants and the strengths and weaknesses of their contentions and is in the best position to evaluate whether the settlement *constitutes a reasonable compromise*," *id.* (emphasis added), phrasing that suggests the reasonableness of a settlement may depend upon the parties' demonstrated ability to compromise their contentions on important contested issues. Additional responsibilities of the district judge are articulated by the Second Circuit in *Handschu*: "The district court must, of course, ensure that the settlement is fair and not a product of collusion, and that class members' interests were represented adequately." *Id.* A trial judge who heeds this appellate guidance may look forward, in sure and certain hope, to the benediction the Second Circuit bestowed in *Handschu*: "If the court then approves a settlement based upon well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, the settlement should be upheld on review." *Id.* (citations omitted).

The Second Circuit adheres to these principles in its more recent cases, exemplified by *McReynolds v. Richards–Cantave*, 588 F.3d 790 (2d Cir. 2009). *McReynolds* affirmed the settlement of a class action relating to the removal of abused and neglected children from their homes. Judge Miner's opinion quoted the requirements of Rule 23(e)(2), and then said:

> We have recognized a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery. Such a presumption is consistent with the strong judicial policy in favor of settlements, particularly in the class action context. This Court will disturb a judicially-approved [class action] settlement only when there is a clear showing that the District Court abused its discretion.
>
> In determining whether a settlement is fair, reasonable, and adequate, the District Court examines the negotiating process leading up to the settlement[, *i.e.*, procedural fairness,] as well as the settlement's substantive terms[, *i.e.*, substantive fairness].

588 F.3d at 803–04 (citations and internal quotation marks omitted).

As for procedural fairness in *McReynolds*, the Second Circuit cautioned that the trial court "must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's length negotiations and that plaintiff's counsel possessed the necessary experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Id.* at 804 (citation, internal quotation marks, ellipsis, and brackets omitted). Agreeing with the trial judge, the Second Circuit held that "there was no question that the Settlement is the product of arm's length, good faith negotiation,"

there was "no indication that the Settlement was the product of bad faith or collusion," and "[t]he extended and transparent negotiations involved in this case were sufficient evidence for the District Court to conclude that the settlement process was procedurally fair." *Id.* (citations and internal quotation marks omitted). As for substantive fairness, the Second Circuit held that the District Court paid sufficient attention to potential factors listed in lead cases like *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). *McReynolds,* 588 F.3d at 804.

These principles will inform this Court's evaluation of the Revised Settlement Agreement.

**II**

The Initial Settlement Agreement included, indeed was structured around, further revisions to the Modified Handschu Guidelines which the Court had approved in 2003. A prominent feature of the proposed Settlement and Guidelines was the presence on the newly created Handschu Committee of a "Civilian Representative" ("CR"), whose appointment, functions and responsibilities were described in Section VI(3) of the Guidelines.[2] *See* the October Ruling, 2016 WL 7048839, at *8–9.

When counsel for the parties jointly recommended that the Court approve the Initial Settlement Agreement, Class Counsel's submissions referred with pardonable satisfaction to the City's acceptance of the Civilian Representative, whose presence would fill a vacancy that had developed in the Guidelines structure. Notwithstanding that understandable exercise in self-approbation, I had occasion to note in the October Ruling, which was preceded by the fairness hearing, that "[t]he status and functions of the Civilian Representative ('CR') on the Handschu Committee" were the subjects which "have generated more comments and objections from the Muslim community and the public at large than any other." *Id.* at *16. The October Ruling held that because of the limitations and restrictions placed upon the Civilian Representative's functions, coupled with the nature and duration of the CR's appointment and retention by the Mayor, "the proposed role and powers of the Civilian Representative do not furnish sufficient protection from potential violations of the constitutional rights of those law-abiding Muslims and believers in Islam who live, move and have their being in this City." *Id.* at *18. In that regard, and in the parlance of class action settlement jurisprudence, I regarded the Initial Settlement Agreement as *unreasonable,* and consequently declined to approve it.

The October Ruling concluded with these judicial observations:

In the Court's view, in order to render the proposed settlement fair and reasonable in the circumstances of the case, the parties should give consideration to agreeing upon the following points: .... [suggested additional Guidelines provisions omitted].

The parties are entirely at liberty to decide whether they are willing to settle the motion of the Plaintiff Class for injunctive relief on terms which include these considerations, in words or substance. If such an agreement is reached, the Court will approve it as fair and reasonable. Failing agreement, and if Class Counsel decides to press the issue, litigation on the Class's motion for an injunction will resume. The Court will

---

**2.** The October Ruling referred to the several divisions of the Guidelines as "Parts." The Guidelines themselves use the internal designation "Sections." I use that designation in this Ruling.

then decide the injunction motion, including the Class's request that the Court appoint a monitor, on a full evidentiary record, which does not presently exist. Nothing said in this Ruling should be read to intimate any view of the Court about what decision would be made on the basis of a full record.

*Id.* at \*19–20.

A hypercritical reader might question whether this was appropriate conduct on the part of a trial judge, whose function under Rule 23 could be interpreted as limited to deciding whether a class action settlement proposed by the parties is fair and reasonable. A judge must resist the temptation of thinking that what he does must be right because he has done it. On this occasion, however, I am reassured by the Second Circuit's approval in principle, as expressed in *Plummer v. Chemical Bank,* 668 F.2d 654 (2d Cir. 1982), which affirmed the district court's disapproval of a proposed settlement of an employment discrimination class action. The Second Circuit said in the text of its opinion at 655: "This affirmance is without prejudice therefore to a renewed application by appellants, with such changes, if any, in substance and procedure as *court and counsel* deem proper." *Id.* at 655 (emphasis added). At that point the court of appeals drops footnote 1, which reads:

> The district judge should not take it upon himself to modify the terms of the proposed settlement decree, nor should he participate in any bargaining for better terms. However, a dissatisfied judge may, with circumspection, "edge" the parties in what he believes to be the right direction.

*Id.* at 656 n.1 (citations omitted).

In the case at bar, the closing paragraphs of the October Ruling constituted the Court's effort to "edge" the parties toward more reasonable provisions for the Civilian Representative. That effort may have been devoid of subtlety, but I prefer to think it was sufficiently circumspect, given the Court's declarations that the parties were entirely free to move in what the Court believed to be the right direction, or dig in their heels and not budge, in which event we would all get on with the trial, the Court having declared its preservation of an open mind pending completion of the evidentiary record.

## III

The parties have now signified through counsel their joint agreement to the additional Guidelines provisions the Court asked them to consider.

The process of further negotiation and ultimate acceptance took considerable time. The considerations in question were voiced in a Ruling signed on October 28, 2016; Mr. Eisenstein's declaration announcing the joint agreement is dated March 6, 2017. During that interval, counsel for the parties found it necessary to request, and the Court granted, a number of extensions of previously set time limits.

The Court stressed throughout the concern of members of the Muslim community, powerfully articulated during the fairness hearing, for approval of a settlement they regarded as favorable as quickly as possible. Counsel for all parties concerned responded to the circumstances with characteristic skill, good will, and devotion. However, the issues were sensitive, complex and not without difficulty. Corporation Counsel, for example, had to deal with tensions inherent in suggestions to professional police commanders and officers that they must put up with civilian oversight of any degree. A lawyer's certificate to practice recites that he or she is an "attorney and counselor at law." These are related but different skills. The profession re-

quires that a lawyer have both. An attorney tries to persuade a judge how to decide; a counselor tries to persuade a client how to behave; both tasks can be difficult. This important and sensitive case has reached the stage of proposed settlement in large measure because of the professional and personal quality of the lawyers involved.

Part III of this Ruling analyzes the particular changes to the Handschu Guidelines which would be achieved by the Revised Settlement Agreement. I begin that exercise by referring to "Tab A" to the Eisenstein declaration of March 6, which at ¶ 3 describes Tab A as "a blackline of the Revised Handschu Guidelines showing the changes now proposed compared to the 2016 proposal." Tab A accomplishes that task by displaying the presently proposed printed text of the Revised Guidelines, with deleted language indicated by blue lines striking what is deleted, and added language indicated by underlined blue text specifying what is new. This presentation enables the reader to see at a glance what changes have been made to the Guidelines presented with the Initial Settlement Agreement: a useful perception, since the Court, having rejected the Initial Settlement as unreasonable, is now asked to approve the Revised Settlement Agreement and attendant Guidelines as reasonable.

It is immediately apparent that the only changes in these two versions of the Guidelines are found in Section VI, captioned "Handschu Committee," which contains in subsections VI(5) and (5)(a)–(k) detailed provisions for the inclusion of "a Civilian Representative" on the Handschu Committee, as well as the powers, functions and responsibilities of the Civilian Representative within the Committee.

The Handschu Committee's *raison d'être* is introduced by the provision in Section VI(1) that its members "are expected and authorized to attend and participate in monthly meetings at which investigations are presented for opening, extension or closure by the Deputy Commissioner for Intelligence." Almost all of the current Guidelines changes relate to the Civilian Representative ("CR"), an unsurprising focus, since the disapproval of the Initial Settlement Agreement was based principally upon the Court's conclusion that the initial Guidelines provisions for the CR's appointment, retention, role and powers were unreasonable. The Court's October Ruling undertook to "edge" the parties (so to speak) in a different direction. The parties now attempt to do so, in the following specific ways, graphically revealed by Tab A.

* While the initial Guidelines provided only that members of the Handschu Committee "may" attend and participate in monthly meetings of the Committee, the revised Guidelines strike the word "may" and substitute "are expected and authorized to attend" the monthly meetings. Section VI(1). This heightened responsibility impacts the Civilian Representative because his or her presence on the Handschu Committee is mandated by Section VI(5).

* Subsections VI(2) and (4) of the revised Guidelines clarify and expand the power of all Handschu Committee members, at monthly or quarterly Committee meetings, to "inquire into" or "raise concerns regarding" a particular investigation (the subject of the monthly meetings) or general compliance with the Handschu Guidelines (the subject of the quarterly meetings). The revised Guidelines which provide specifically for the Civilian Representative are found in Section VI(5). The most important provisions and changes appear in that subsection. For the sake of clarity, I will refer in what follows to "initial VI(3)" and "revised VI(5)."

* Initial VI(3), after mandating that "[t]here shall also be a Civilian Representative on the Handschu Committee," modulates into permissive terms and provides that the CR "may attend and participate in the monthly meetings" of the Committee. No mention is made of the CR's attendance at the quarterly meetings. Revised VI(5), shifting from permissive to mandatory, provides that the Civilian Representative "shall, unless able to do so for good cause, attend and participate in all of the monthly meetings for opening, extension or closure of investigations and in all of the quarterly discussions led by the Special Counsel for Intelligence Affairs," the Special Counsel being directed by Section VI(4) to "lead a quarterly discussion for the Handschu Committee related to the NYPD's compliance during that period" with the Guidelines' operational requirements.

* Initial VI(3) provides, as does revised VI(5), that the Civilian Representative shall be a lawyer who has never been an NYPD employee, appointed by the Mayor upon consultation with the Police Commissioner, and may be replaced by the Mayor "for good cause," on 14 days' advance notice to Class Counsel. No mention is made in initial VI(3) of the CR's possible resignation. Revised VI(5) provides: "In the event the Civilian Representative resigns, the Mayor in consultation with the Police Commissioner will appoint a replacement."

* A significant change occurs with respect to the termination of the Civilian Representative's appointment. Initial VI(3) provides:

The position of Civilian Representative will exist for a minimum of five years from the appointment of the first person to fill that role. After that initial five year period, the position of Civilian Representative will continue unless abolished or modified by the Mayor, upon which Class Counsel will receive 90 days' notice in advance of such abolition or modification.

Following the first quoted sentence, which remains the same, revised VI(5) provides:

After that initial five year period, the position of Civilian Representative will continue unless the Mayor applies to the Court for an amendment to the Revised Handschu Guidelines abolishing the position, upon 30 days' advance notice to Class Counsel prior to such application. The amendment to the Revised Handschu Guidelines abolishing the position shall be granted by the Court if the Court finds there have not been systematic and repeated violations of the Guidelines to a degree sufficient to show an NYPD policy to act in such a fashion for a period of three years immediately prior to the application, as shown in the reports submitted to the Court by the Civilian Representative.

The phrase "as shown in the reports submitted to the Court by the Civilian Representative," as used in the quoted language from revised Section VI(5) of the Guidelines, refers to several forms of reports contemplated by subsections VI(5)(g), (h) and (i). The provisions in those subsections are new additions to the Guidelines. To comprehend them, one must also consider VI(5)(e) and VI(5)(f), which also contain new language, and provide pertinent background.

* Revised VI(5)(e) applies "[i]f the Civilian Representative concludes that an investigation is being opened, extended or conducted in violation of the Revised Handschu Guidelines, or that the NYPD is otherwise violating the Revised Handschu Guidelines." The revision adds the phrases "or conducted" and "is otherwise violating" to the text of initial VI(3)(e). In such circumstances, the CR "shall record his or her concerns regarding the purported vio-

lation and/or his or her objection to the investigation and the grounds for the objection in the minutes of the Handschu Committee meeting." The revision to VI(5)(e) adds a mandatory recording in the minutes of the CR's "concerns"; the initial VI(3)(e) spoke only of recording a CR's "objection."

* Revised VI(5)(f) follows up on VI(5)(e) by providing that "[i]f the Civilian Representative concludes that an investigation is being opened, extended, or conducted" in violation of the Guidelines, the CR "shall be provided with means to present his or her conclusion to the Police Commissioner directly." The revision denominates such a presentation by the Civilian Representative as "a VI(5)(f) communication." Revised VI(5)(f) then provides: "The Police Commissioner shall inquire into the investigation and report the findings of the inquiry to the Civilian Representative within seven (7) days after receipt of the VI(5)(f) communication." The Police Commissioner's obligation to report his findings to the Civilian Representative within seven days is new. Initial VI(3)(f) obligated the Commissioner to respond, but there was no time limit for doing so.

* Revised VI(5)(g) differs significantly from the Guidelines which accompanied the Initial Settlement Agreement. Revised VI(5)(g) does not mention a systemic violation by the NYPD; that subject is dealt with in a revised VI(5)(h). Revised VI(5)(g), containing new language I need not quote in full, provides in summary that if the Civilian Representative "has concerns about the NYPD's compliance with the Revised Handschu Guidelines, and the Police Commissioner has not provided a timely response to the Civilian Representative's VI(5)(f) communication regarding such concerns, or the Civilian Representative is not satisfied with the Police Commissioner's response, the Civilian Repre-

sentative may communicate those concerns to the Judge assigned to the Handschu case in the Southern District of New York [hereafter 'the Court'] at any time." That is a change, because the initial VI(3) protocols did not allow for a communication between the Civilian Representative and the Court at that stage. In the October Ruling, 2016 WL 7048839 at *9, I observed that "if a single incident is involved, the CR blows his whistle in the office of the Police Commissioner, who is directed by the Guidelines to 'inquire into the investigation and report the findings of the inquiry to the Civilian Representative.' Apparently the Commissioner can do anything about the substance of the inquiry that seems right to him, which puts an end to the matter." Perhaps it was arguable that the initial VI(3) provisions impliedly authorized the Civilian Representative to complain to the Court about the Commissioner's disregard of the CR's discontent about a particular incident, but that argument need not now be made—revised VI(5)(g) expressly confers upon the CR the discretion to do so.

* Revised VI(5)(h) deals with a conclusion by the Civilian Representative that the NYPD is systematically and repeatedly violating the Guidelines. The subparagraph begins by saying: "After complying with provision VI(5)(f) hereof, if the Civilian Representative concludes at any time that the NYPD is systematically and repeatedly violating the Revised Handschu Guidelines to a degree sufficient to show a NYPD policy to act in such a fashion, the Civilian Representative *shall report* the alleged systematic violation" (emphasis added) to the Handschu case assigned Judge. The next sentence creates some ambiguity about whether the CR's reaction in that circumstance is mandatory or discretionary, since it begins with the phrase "[i]n the event the Civilian Representative *decides to communicate such concerns* to

the Court ..." (emphasis added), but I hold that a mandatory report to the Court by the CR is the only reasonable construction, since one cannot imagine why a Civilian Representative would conclude that the NYPD had embarked upon an illicit policy of violating the Handschu Guidelines (and consequently a Court order) and not tell the Court about it. After providing for notice to be given by the CR to the NYPD of such an intended report, revised VI(5)(h) ends with the recitation: "Submission to the Court shall be effectuated in compliance with Section VI(5)(k) below."

* Revised VI(5)(i) is a new subparagraph which introduces an additional report from the Civilian Representative to the Court: a mandatory annual report. The subparagraph begins with the direction: "In addition, the Civilian Representative shall file an annual report with the Court related to his or her actions and observations as a member of the Handschu Committee." It then sets forth a comprehensive list of subjects to be covered by the report. That list includes all activities, observations, and opinions falling within the Civilian Representative's personal role and responsibilities (as discussed in this Ruling) during the year covered by the report, and (painting with a broader brush) the CR's perceptions of whether the NYPD has complied with a number of operational obligations imposed by the Guidelines upon the NYPD. The Civilian Representative is directed to give the Police Commissioner and two Deputy Commissioners 21 days' advance notice of the submission of this annual report to the Court.

* Revised VI(5)(j) contains provisions for the exclusion from any of these reports and communications of any classified, privileged or protected information under federal or state law. Revised VI(5)(k) contains detailed instructions about how these concerns are to be implemented, and the manner in which the Court would resolve any questions about whether a particular document should be kept under seal, redacted, or made public. These sensible provisions do not implicate the fairness, reasonableness or adequacy of the proposed Revised Settlement Agreement, and I say nothing further about them.

## IV

Having carefully considered the history and recent circumstances of this case, the Court concludes that the Revised Settlement Agreement is fair, reasonable, and adequate to and for all parties affected by it. The Court will approve the settlement.

The revisions to Section VI of the Guidelines adequately address the concerns which prevented the Court from approving the Initial Settlement Agreement. Those concerns focused upon the role and functions of the Civilian Representative. The reintroduction of some measure of civilian oversight had become necessary because "the history of the NYPD's adherence to the Handschu Guidelines has been problematic at times." October Ruling, 2016 WL 7048839, at *18. The most recent problems have surfaced in connection with the NYPD's surveillance of the City's Muslim community, giving rise to the present motion by the Plaintiff Class for equitable relief. While the Guidelines accompanying the Initial Settlement Agreement created a "Civilian Representative" and seated that individual among the members of the newly formed Handschu Committee, the conditions and limitations placed upon the Civilian Representative's appointment, retention, role, and responsibilities rendered the CR perilously close to a state of muzzled impotence which the Court was constrained to regard as unreasonable.

The Revised Settlement Agreement and attendant Guidelines effectively cure that

unsatisfactory condition. The Civilian Representative is now unbound, given voice, and freed from the Mayor's unfettered discretion in respect of the term of appointment. To recapitulate: As a result of the revisions, the Civilian Representative must attend the previously existing monthly meetings and newly mandated quarterly meetings of the Handschu Committee; the CR is required to enter his or her concerns in the meeting minutes; the CR must receive prompt responses from the Police Commissioner about concerns the CR has expressed to the Commissioner; the CR may communicate to the Court his discontent with any response from the Commissioner; the CR must send a comprehensive annual report to the Court; the CR must report to the Court if at any time the CR concludes that the NYPD is systematically and repeatedly violating the Guidelines; and the position of Civilian Representative will continue after the initial five-year term unless the Mayor applies to end it and persuades the Court to find that "there have not been systematic and repeated violations of the Guidelines to a degree sufficient to show an NYPD policy to act in such a fashion for a period of three years immediately prior to the application, as shown in the reports submitted to the Court by the Civilian Representative."

These revisions amount to a material, effective, and reasonable restructuring of the position of Civilian Representative on the Handschu Committee. It does not go as far as Class Counsel requested in the underlying motion. Their outrage at media revelations of NYPD surveillance of Muslims prompted counsel to seek a Court order "appointing an auditor or monitor to supervise compliance by the NYPD, its employees and agents with the injunctive orders made herein mandating obedience to the Modified Handschu Guidelines in investigations of political activity by members of the plaintiff class." October Ruling, 2016 WL 7048839, at *4. Corporation Counsel, professing full compliance by the NYPD with the Guidelines, contended that no monitor or other civilian presence should be appointed. Under the Revised Settlement Agreement, a Civilian Representative comes into being where the City would have preferred none, but with less than the broad powers and responsibilities Class Counsel requested. This is the essence of compromise. The settlement is fair and reasonable because, having passed through the revision process, it now strikes a proper balance between the private rights of the members of the City's Muslim and Islamic communities, and the public safety, entrusted to the NYPD, of all who dwell in or visit the City.

This settlement also satisfies the other standards and criteria required by appellate authority. When the Second Circuit affirmed the first *Handschu* settlement, its opinion emphasized a comparison of "the terms of the compromise with the likely rewards of litigation," and noted approvingly this Court's determination that limitations on its equity power "would not permit it to grant much of the injunctive relief that plaintiffs sought." 787 F.2d at 833 (citations and internal quotation marks omitted). The risks and uncertainties of litigation continue to affect the parties' prospects in keeping on with the litigation. The October Ruling noted and took into consideration a finding by the City's Inspector General that the NYPD repeatedly failed to follow Guidelines relating to the ongoing supervision of "inquiries or investigations which were properly initiated and are continuing." 2016 WL 7048839, at *12. That factor, in the Court's view, argued for increasing the powers and responsibilities of the Civilian Representative. However, the Inspector General's report also concluded (in a passage to which the NYPD

gave greater prominence) that the NYPD "has been articulating valid reasons for its general decisions to open particular cases." *Id.* at *11. One would expect the City to stress that aspect in continuing litigation, as a substantive reason why the Court should not appoint a monitor with the broad powers demanded by Class Counsel in their present motion. The proposed settlement, now revised to enhance the Civilian Representative's role, constitutes "a reasonable compromise" and "a fair resolution of the parties' differences," to quote again the Second Circuit's earlier *Handschu* opinion, 787 F.2d at 833.

The other recognized factors all militate in favor of approving the Revised Settlement Agreement. There is no indication that the settlement is a product of collusion. The attorneys for all parties—Class, City, the *Raza* plaintiffs before Judge Chen in the Eastern District—are able and experienced, and have given their respective clients exemplary representation. The revised settlement is the product of extended negotiations, preceded by a substantial amount of discovery, whose boundaries were supervised by the Court; indeed, negotiations had to be resumed after the Court declined to approve the initial settlement proposal. The revised settlement is, in short, fair, reasonable and adequate, achieved without collusion and after lengthy arm's length negotiations between attorneys of high professional quality.

## V

### CONCLUSION

For the foregoing reasons, the Revised Settlement Agreement described in the Eisenstein Declaration executed on March 6, 2017 [Doc. 470] is APPROVED by the Court.

The Revised Handschu Guidelines, which contain all the changes proposed by the parties, are attached as Tab C to the Eisenstein Declaration. Those Guidelines are also APPROVED by the Court. They are incorporated by reference in this Ruling and Order.

This Ruling is marked "SO ORDERED" by the Court for the purpose, *inter alia,* of ensuring that the undertakings specified in the Guidelines, including the appointment, funding, and support of the Civilian Representative, will be faithfully performed by the party or parties concerned. This follows the Court's prior practice of making Guidelines revisions and related directions orders of the Court.

The foregoing is SO ORDERED.

### EXHIBIT A

### GUIDELINES FOR INVESTIGATIONS INVOLVING POLITICAL ACTIVITY

### PREAMBLE

Subsequent to the terrorist attacks on the City of New York on September 11, 2001 which resulted in the loss of thousands of lives and the total destruction of the World Trade Center complex, it became apparent that the City faces unprecedented threats to its continued safety and security. In the view of federal, state and local law enforcement agencies, the prevention of future attacks requires the development of intelligence and the investigation of potential terrorist activity before an unlawful act occurs.

As a result of a federal court order entered in 1985, the New York City Police Department was bound by guidelines, known as the Handschu Guidelines, which governed the investigation of political activity. The Handschu Guidelines (i) limited the investigation of political activity to those circumstances when there was specific information of criminal activity and (ii) established the Handschu Authority to

oversee compliance. After evaluating the impact of the Handschu Guidelines on the need to investigate terrorism in a changed world, the City made an application to modify the order so as to eliminate the restrictions contained in the Handschu Guidelines and the oversight of the Handschu Authority with respect to those restrictions. The City did not seek to eliminate the Handschu Authority's role to investigate an individual's complaint that the NYPD had engaged in unconstitutional conduct in the investigation of political activity.

The Court granted the City's application to modify the decree provided the City adopt the internal guidelines set forth below and distribute the guidelines to supervisory personnel who, in turn, were to make them known to those under their command. These guidelines were subsequently incorporated into an order of the Court in 288 F.Supp.2d 411, 420 (S.D.N.Y. 2003) and are enforceable as set out in 679 F.Supp.2d 488, 497 (S.D.N.Y. 2010). They shall remain in effect unless otherwise ordered by the Court. These guidelines are binding on all members of the service who are engaged in the investigation of political activity. It is the purpose of these guidelines to enable officers to perform their duties with greater certainty, confidence and effectiveness while at the same time protecting the guarantees of the Constitution.

## I. STATEMENT OF POLICY

It is the policy of the New York City Police Department that investigations involving political activity conform to the guarantees of the Constitution, including the guarantee of equal protection. It is the policy of the New York City Police Department that care be exercised in the conduct of those investigations so as to protect constitutional rights, including the right to be free from investigation in which race, religion, or ethnicity is a substantial or motivating factor. It is the policy of the New York City Police Department that matters investigated be confined to those supported by a legitimate law enforcement purpose.

## II. GENERAL PRINCIPLES

(1) In its effort to anticipate or prevent unlawful activity, including terrorist acts, the NYPD must, at times, initiate investigations in advance of unlawful conduct. It is important that such investigations not be based solely on activities protected by the First Amendment. It is also important that investigations not intrude upon rights of expression or association in a manner that discriminates on the basis of race, religion or ethnicity, where such discrimination is a substantial or motivating factor for the investigation. When, however, statements advocate unlawful activity, or indicate an apparent intent to engage in unlawful conduct, particularly acts of violence, an investigation under these guidelines may be warranted, unless it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm.

(2) Based upon the circumstances of a given case, investigative action may be required under exigent circumstances. Exigent circumstances are circumstances requiring action before authorization otherwise necessary under these guidelines can reasonably be obtained, in order to protect life or substantial property interests; to apprehend or identify a fleeing offender; to prevent the

hiding, destruction or alteration of evidence; or to avoid other serious impairment or hindrance of an investigation.

When any investigative action, taken under exigent circumstances, would require an approval under ordinary conditions, such approval shall be obtained as soon as practicable in accordance with the provisions of these guidelines. Where a regular approval or request is required to be in writing, the approval or request following exigent circumstances shall also be in writing.

(3) Investigations shall be terminated when all logical leads have been exhausted and no legitimate law enforcement purpose justifies their continuance.

## III. APPLICABILITY

These guidelines apply only to investigations which involve political activity. They do not apply to, or limit, other activities of the NYPD in the investigation or detection of unlawful conduct, the preservation of the peace and public safety or other legitimate law enforcement activities which do not involve political activity.

## IV. ROLE OF THE INTELLIGENCE BUREAU

(1) Investigation of political activity shall be initiated by, and conducted under the supervision of the Intelligence Bureau. Nothing in this paragraph, however, is intended to prevent any member of the service from reporting his or her observations of suspicious conduct which involves political activity to his or her commanding officer or to the Intelligence Bureau.

(2) The Deputy Commissioner of Intelligence shall periodically inform and advise the Police Commissioner concerning the status of any investigations conducted pursuant to these guidelines.

## V. LEVELS OF INVESTIGATION

These guidelines provide for three levels of investigative activity. They are intended to provide the NYPD with the necessary flexibility to act well in advance of the commission of planned terrorist acts or other unlawful activity. However, if the available information shows at the outset that the threshold standard for a Preliminary Inquiry or Full Investigation is satisfied, then the appropriate investigative activity may be initiated immediately, without progressing through more limited investigative stages.

### A. Checking of Leads

The lowest level of investigative activity is the "prompt and extremely limited checking out of initial leads," which should be undertaken whenever information is received of such a nature that some follow-up as to the possibility of unlawful activity is warranted. This limited activity should be conducted with an eye toward promptly determining whether further investigation (either a Preliminary Inquiry or a Full Investigation) should be conducted.

*Example: If the NYPD receives an allegation that an individual or group has advocated the commission of violence, and no other facts are available, an appropriate first step would be Checking of Leads to determine whether the individual, group, or members of the audience have the apparent ability or intent to carry out the advocated unlawful act.*

**B. Preliminary Inquiries**

(1) In cases where the NYPD receives information or an allegation not warranting a Full Investigation—because there is not yet a "reasonable indication" of unlawful activity—but whose responsible handling requires some further scrutiny beyond the prompt and extremely limited checking out of initial leads, the NYPD may initiate an "inquiry" in response to the allegation or information indicating the possibility of unlawful activity. The possibility of unlawful activity to initiate a Preliminary Inquiry requires an allegation or information that is articulable and factual. However, such allegation or information need not have been verified as true or accurate. Whether it is appropriate to open a Preliminary Inquiry immediately, or instead to engage first in a limited Checking of Leads, depends on the circumstances presented.

(2) The authority to conduct inquiries short of a Full Investigation allows the NYPD to respond in a measured way to ambiguous or incomplete information, with as little intrusion as the needs of the situation permit. This is especially important in such areas as where there is no complainant involved or when an allegation or information is received from a source of unknown reliability. Such inquiries are subject to the limitations on duration under paragraph (4) below and are carried out to obtain the information necessary to make an informed judgment as to whether a Full Investigation is warranted.

*Example: Officers are not required to possess information relating to an Individual's intended unlawful use of dangerous biological agents or toxins prior to initiating investigative activity. If an individual or group has attempted to obtain such materials, or has indicated a desire to acquire them, and the reason is not apparent, investigative action, such as conducting a Checking of Leads or initiating a Preliminary Inquiry, may be appropriate to determine whether there is a legitimate purpose for the possession of the materials by the individual or group. A Preliminary Inquiry is not a required step when facts or circumstances reasonably indicating unlawful activity are already available. In such cases, a Full Investigation can be immediately opened.*

(3) A Preliminary Inquiry may be authorized by the Chief of Intelligence or Executive Officer of the Intelligence Bureau, or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials"). The Authorizing Official must assure that the allegation or other information which warranted the inquiry has been recorded in writing. Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence.

(4) Inquiries shall be completed within 180 days after initiation of the first investigative step. The date of the first investigative step is not necessarily the same date as the date on which the first incoming information or allegation was received. An extension of time in an inquiry for succeeding 90 day periods may be granted by the Deputy Commissioner of Intelligence. Any such re-

quest for extension shall be in writing and shall include a statement of the reasons why further investigative steps are warranted when there is no reasonable indication of unlawful activity. The action taken on any such request for extension shall also be recorded in writing.

(5) A Preliminary Inquiry shall be subject to a review every 6 months by the Chief of Intelligence, or an appropriate executive of the Intelligence Bureau designated by him, to discuss the status of the Preliminary Inquiry, including, what operational steps should be taken.

(6) A Preliminary Inquiry shall be presumptively limited to a total duration of 18 months. This presumptive period of duration may be exceeded in the sole discretion of the Deputy Commissioner of Intelligence, in consultation with the Handschu Committee, where the allegations or information continue to indicate the possibility of unlawful activity and either that some further leads should be lawfully investigated or that there is a legitimate law enforcement purpose to be pursued further. When the presumptive period of duration is exceeded all other provisions regarding a Preliminary Inquiry continue to apply.

(7) All lawful investigative techniques, including the use of undercover operations and the development of sources and informants may be used in a Preliminary Inquiry except:

(a) Mail openings; and,

(b) Eavesdropping and Video Surveillance as those terms are defined in Article 700 of the New York State Criminal Procedure Law.

(8) The following investigative techniques may be used in a Preliminary Inquiry without any prior authorization from a supervisor:

(a) Examination of NYPD indices and files;

(b) Examination of records available to the public and other public sources of information;

(c) Examination of available federal, state and local government records;

(d) Interview of complainant, previously established informants, and other sources of information;

(e) Interview of the potential subject;

(f) Interview of persons who should readily be able to corroborate or deny the truth of the allegation, except this does not include pretext interviews or interviews of a potential subject's employer or coworkers unless the interviewee was the complainant; and

(g) Physical, photographic or video surveillance of any person, provided that such surveillance does not require a warrant.

The use of any other lawful investigative technique that is permitted in a Preliminary Inquiry shall meet the requirements and limitations of Part VII and, except in exigent circumstances, requires prior approval by a supervisor.

(9) Where a Preliminary Inquiry fails to disclose sufficient information to justify an investigation, the NYPD shall terminate the inquiry and make a record of the closing.

(10) All requirements regarding inquiries shall apply to reopened inquiries.

## C. Full Investigation

A Full Investigation may be initiated when facts or circumstances reasonably indicate that an unlawful act has been, is being, or will be committed. A Full Investigation may be conducted to prevent, solve or prosecute such unlawful activity.

(1) The standard of "reasonable indication" is substantially lower than probable cause. In determining whether there is reasonable indication of an unlawful act an investigator may take into account any facts or circumstances that a prudent investigator would consider. However, the standard does require specific facts or circumstances indicating a past, current, or future violation of law. There must be an objective, factual basis for initiating the investigation; a mere hunch is insufficient.

(2) Where an unlawful act may be committed in the future, preparation for that act can be a current violation of the conspiracy or attempt provisions of state law. The standard for opening an investigation is satisfied where there is not yet a current substantive or preparatory unlawful act, but facts or circumstances reasonably indicate that such unlawful conduct will occur in the future.

(3) Any lawful investigative technique may be used in a Full Investigation, subject to the requirements and limitations of Part VI hereof.

(4) Authorization and Renewal

a. A Full Investigation may be authorized by the Chief of Intelligence or Executive Officer of the Intelligence Bureau or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials") upon a written recommendation setting forth the facts or circumstances reasonably indicating that an unlawful act has been, is being or will be committed. Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence.

b. A Full Investigation may be initially authorized for a period of up to a year. An investigation may be continued upon renewed authorization for additional periods each not to exceed a year. Renewal authorization shall be obtained from the Deputy Commissioner of Intelligence. All requests for renewal authorization, and action thereon, shall be in writing.

c. Authorizations shall be reviewed by an Authorizing Official before the expiration of the period for which the investigation and each renewal thereof is authorized.

d. A Full Investigation shall be subject to a review every 6 months by the Chief of Intelligence, or an appropriate executive of the Intelligence Bureau designated by him, to discuss the status of the Full Investigation, including, what operational steps should be taken.

e. A Full Investigation shall be presumptively limited to a total duration of 3 years. This presumptive period of duration may be exceeded in the sole discretion of the Deputy Commissioner of Intelligence, in consultation with the

Handschu Committee, where facts and circumstances continue to reasonably indicate that an unlawful act has been, is being, or will be committed and either that some further leads should be lawfully investigated or that there is a legitimate law enforcement purpose to be pursued further. When the presumptive period of duration is exceeded all other provisions regarding a Full Investigation continue to apply.

(5) An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation. All requirements regarding investigations shall apply to reopened investigations.

## D. Terrorism Enterprise Investigation

A Terrorism Enterprise Investigation is a Full Investigation but differs from a general investigation of unlawful conduct in several important respects. As a general rule, an investigation of a completed unlawful act is normally confined to determining who committed that act and securing evidence to establish the elements of the particular offense. It is, in this respect, self-defining. A Terrorism Enterprise Investigation must determine the identity and nature of the individual, group, or organization involved, its geographic dimensions, its past acts and intended goals, including unlawful goals, and its capacity for harm, among other factors. While a standard investigation of unlawful conduct terminates with the decision to prosecute or not to prosecute, a Terrorism Enterprise Investigation does not necessarily end, even though one or more of the participants may have been prosecuted. In addition, groups and organizations exhibit a life and continuity of operation not normally found in other types of unlawful activity. As a consequence, these investigations may continue for several years. Furthermore, the focus of such investigations may be less precise than that directed against more conventional types of unlawful conduct. Unlike the usual case involving unlawful conduct, there may be no completed offense to provide a framework for the investigation. A Terrorism Enterprise Investigation often requires the fitting together of bits and pieces of information, many meaningless by themselves, to determine whether a pattern of unlawful activity exists. For this reason, such investigations are broader and less discriminate than usual, involving the interrelation of various sources and types of information. This section focuses on investigations of enterprises that seek to further political or social goals through activities that involve force or violence, or that otherwise aim to engage in terrorism or terrorism-related crimes. It authorizes investigations to determine the structure and scope of the enterprise as well as the relationship of the members.

### 1. General Authority

a. A Terrorism Enterprise Investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of:

(i) furthering political or social goals wholly or in part through activities that involve force, violence or other unlawful acts;

(ii) engaging in terrorism as defined in N.Y. Penal Law § 490.05, or

(iii) committing any offense described in N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, or 490.35, or other related statutes currently in effect or subsequently enacted.

The standard of "reasonable indication" is identical to that governing Full Investigations generally. In determining whether an investigation should be conducted, the NYPD shall consider all of the circumstances including:

(i) the magnitude of the threatened harm;

(ii) the likelihood that it will occur;

(iii) the immediacy of the threat; and

(iv) any danger to privacy or free expression posed by an investigation.

In practical terms, the "reasonable indication" standard for opening a Terrorism Enterprise Investigation could be satisfied in a number of ways.

*Example: Direct information about statements made in furtherance of an enterprise's objectives which show a purpose of committing crimes described in N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, 490.35 or other related statutes currently in effect or subsequently enacted, would satisfy the threshold.*

*Example: Activities such as attempting to obtain dangerous biological agents, toxic chemicals, or nuclear materials, or stockpiling explosives or weapons, with no discernible lawful purpose, may be sufficient to reasonably indicate that an enterprise aims to engage in terrorism.*

b. While no particular factor or combination of factors is required, consid-erations that will generally be relevant to the determination as to whether the threshold standard for a Terrorism Enterprise Investigation is satisfied include, as noted, a group's statements, its activities, and the nature of potential unlawful acts suggested by the statements or activities. Thus, where there are grounds for inquiry concerning a group, it may be helpful to gather information about these matters, and then to consider whether these factors, either individually or in combination, reasonably indicate that the group is pursuing terrorist activities or objectives as defined in the threshold standard. Findings that would weigh in favor of such a conclusion include, for example, the following:

(1) Threats or advocacy of violence or other covered unlawful acts. Statements are made in relation to or in furtherance of an enterprise's political or social objectives that threaten or advocate the use of force or violence, or statements are made in furtherance of an enterprise that otherwise threaten or advocate unlawful conduct within the scope of N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, 490.35, or other related statutes currently in effect or subsequently enacted which may concern such matters as, for example:

(i) engaging in attacks involving or threatening massive loss of life or injury, mass destruction, or endangerment of the national security;

(ii) killing or injuring public officials, or destroying public facilities, or defying lawful authority;

(iii) killing, injuring or intimidating individuals because of their status as United States nationals or persons, or because of their national origin, race, color, religion or sex; or

(iv) depriving individuals of any rights secured by the Constitution or laws of the United States or the State of New York.

(2) Apparent ability or intent to carry out violence or other covered activities. The enterprise manifests an apparent ability or intent to carry out violence or other activities within the scope of N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, 490.35 or other related statutes currently in effect or subsequently enacted, for example:

(i) by acquiring or taking steps towards acquiring, biological agents or toxins, toxic chemicals or their precursors, radiological or nuclear materials, explosives or other destructive or dangerous material (or plans or formulas for such materials), or weapons, under circumstances where, by reason of the quantity or character of the items, the lawful purpose of the acquisition is not apparent;

(ii) by the creation, maintenance, or support of an armed paramilitary organization;

(iii) by paramilitary training; or

(iv) by other conduct demonstrating an apparent ability or intent to injure or intimidate individuals, or to interfere with the exercise of their constitutional or statutory rights.

(3) Potential Unlawful Act. The group's statements or activities suggest potential unlawful acts that may be relevant in applying the standard for initiating a Terrorism Enterprise Investigation—such as crimes under the provisions of the N.Y. Penal Law that set forth specially defined terrorism or support of terrorism offenses, or that relate to such matters as aircraft hijacking or destruction, attacks on transportation, communications, or energy facilities or systems, biological or chemical weapons, nuclear or radiological materials, assassinations or other violence against public officials or facilities, or explosives.

c. Mere speculation that force or violence might occur during the course of an otherwise peaceable demonstration is not sufficient grounds for initiation of an investigation under this subpart. But where facts or circumstances reasonably indicate that an individual or group has engaged or aims to engage in conduct described in paragraph 1.a. above in a demonstration, an investigation may be initiated in conformity with the standards of that paragraph. This does not limit the collection of information about public demonstrations by individuals or groups that are under active investigation pursuant to paragraph 1.a. above or any other provisions of these guidelines.

## 2. Purpose

The immediate purpose of a Terrorism Enterprise Investigation is to obtain information concerning the nature and

structure of the enterprise as specifically delineated in paragraph (3) below, with a view to the longer range objectives of detection, prevention, and prosecution of the unlawful activities of the enterprise.

### 3. Scope

a. A Terrorism Enterprise Investigation initiated under these guidelines may collect such information as:

(i) the identity and nature of an individual or group and its members, their associates, and other persons likely to be acting in furtherance of its unlawful objectives, provided that the information concerns such persons' activities on behalf of or in furtherance of the suspected unlawful activity of the individual, group, or organization;

(ii) the finances of the individual, group, or organization;

(iii) the geographical dimensions of the individual, group, or organization; and

(iv) past and future activities and goals of the individual, group, or organization.

b. In obtaining the foregoing information, any lawful investigative technique may be used in accordance with the requirements of these guidelines.

### 4. Authorization and Renewal

a. A Terrorism Enterprise Investigation may be authorized by the Chief of Intelligence or Executive Officer of the Intelligence Bureau or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials"), upon a written recommendation setting forth the facts or circumstances reasonably indicating the existence of an enterprise as described in paragraph 1.a. above. Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence. When exigent circumstances exist, as described in these guidelines, a Terrorism Enterprise Investigation may be commenced upon the verbal authorization of an Authorizing Official. However, in such cases, the required written recommendation must be submitted as soon as practicable.

b. A Terrorism Enterprise Investigation may be initially authorized for a period of up to a year. An investigation may be continued upon renewed authorization for additional periods each not to exceed a year. Renewal authorization shall be obtained from the Deputy Commissioner of Intelligence. The request for renewal and action thereon shall be in writing.

c. Authorizations shall be reviewed by an Authorizing Official before the expiration of the period for which the investigation and each renewal thereof is authorized. In some cases, the enterprise may meet the threshold standard but be temporarily inactive in the sense that it has not engaged in recent acts of violence or other unlawful activities as described in 1.a., nor is there any immediate threat of harm—yet the composition, goals and prior history of the group suggest the need for continuing law enforcement interest. The investigation may be continued in such cases with whatever

scope is warranted in light of these considerations.

d. All Terrorism Enterprise Investigations shall be subject to a review every 6 months by the Chief of Intelligence, or an appropriate executive of the Intelligence Bureau designated by him, to discuss the status of the Terrorism Enterprise Investigation, including, what operational steps should be taken.

e. A Terrorism Enterprise Investigation shall be presumptively limited to a total duration of 5 years, except where the subject of a Terrorism Enterprise Investigation is a designated foreign terrorist organization. This presumptive period of duration may be exceeded in the sole discretion of the Deputy Commissioner of Intelligence, in consultation with the Handschu Committee, where facts and circumstances continue to reasonably indicate that two or more persons are engaged in an enterprise for the purposes stated above and either that some further leads should be lawfully investigated or that there is a legitimate law enforcement purpose to be pursued further. When the presumptive period of duration is exceeded all other provisions regarding a Terrorism Enterprise Investigation continue to apply.

f. An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation.

## VI. HANDSCHU COMMITTEE

(1) There is hereby established a committee (the "Handschu Committee") whose members are expected and authorized to attend and participate in monthly meetings at which investigations are presented for opening, extension or closure by the Deputy Commissioner for Intelligence. For each monthly meeting, all attending members will be provided with the investigative statement pertaining to each proposed opening, extension or closing and any corresponding requests to use or extend the use of undercover officers or confidential informants. At the monthly meeting, any member of the Handschu Committee may ask questions and offer opinions regarding the opening, extension or closure of an investigation presented.

(2) Any member of the Handschu Committee may further inquire into the status and conduct of any investigation presented at the meeting, including the use of undercover operations pursuant to section VII herein, provided however that information pertaining to the identity of participants in undercover operations, including confidential informants, shall not be disclosed. A member of the Intelligence Bureau with detailed knowledge of operational steps taken in each investigation presented shall be present at the meeting to help address any questions that arise.

(3) Members of the Handschu Committee from the NYPD will include the Deputy Commissioner of Intelligence, the Chief of Intelligence, the Executive Officer of the Intelligence Bureau, the Commanding Officer of IOAS (Intelligence Operations and Analysis Section), the Executive Officer of IOAS, the Commanding Officer (or the Executive Officer) of the Criminal Intelligence Section, the Assistant Commissioner for Intelligence Analysis, the Deputy Commissioner of Legal Matters, Assistant Deputy Commissioner

of Legal Matters, Special Counsel for Intelligence Affairs, and/or their successors or persons who occupy similar positions of authority or expertise.

(4) The Special Counsel for Intelligence Affairs shall lead a quarterly discussion for the Handschu Committee related to the NYPD's compliance during that period in (i) obtaining timely approval in extending or closing investigations, (ii) obtaining timely approval of human source authorizations, and (iii) conducting reviews of Preliminary Inquiries, Full Investigations, and Terrorism Enterprise Investigations every 6 months, as provided in sections V(B)(5), V(C)(4)(d) and V(D)(4)(d) hereof. As part of this quarterly discussion, any member of the Handschu Committee may raise concerns regarding any other aspect of compliance with the Handschu Guidelines. The substance of these quarterly discussions shall be recorded in the minutes of the Handschu Committee meeting.

(5) There shall also be a Civilian Representative on the Handschu Committee who shall, unless unable to do so for good cause, attend and participate in all of the monthly meetings for opening, extension, or closure of investigations and in all of the quarterly discussions led by the Special Counsel for Intelligence Affairs on the same terms and conditions as set forth in paragraphs (1), (2) and (4) above. The Civilian Representative shall be a lawyer who has never previously been an employee of the NYPD. The Civilian Representative shall be appointed by the Mayor upon consultation with the Police Commissioner. The Civilian Representative may be replaced by the Mayor for good cause, with 14 days' advance notice to Class Counsel prior to such replacement. In the event that the Civilian Representative resigns, the Mayor in consultation with the Police Commissioner will appoint a replacement.

The position of Civilian Representative will exist for a minimum of five years from the appointment of the first person to fill that role. After that initial five year period, the position of Civilian Representative will continue unless the Mayor applies to the Court for an amendment to the Revised Handschu Guidelines abolishing the position, upon 30 days' advance notice to Class Counsel prior to such application. The amendment to the Revised Handschu Guidelines abolishing the position shall be granted by the Court if the Court finds there have not been systematic and repeated violations of the Guidelines to a degree sufficient to show an NYPD policy to act in such a fashion for a period of three years immediately prior to the application, as shown in the reports submitted to the Court by the Civilian Representative.

(a) The Civilian Representative shall submit to a background investigation conducted by the Department of Investigation.

(b) The NYPD will facilitate an application for a federal security clearance for the Civilian Representative.

(c) The Civilian Representative shall execute a Non–Disclosure Agreement with the NYPD setting forth his or her undertaking that the proceedings of the Handschu Committee, as well as all materials reviewed by the Civilian Representative for or at the meetings of the Committee, shall be kept confidential and shall not be disclosed to any person except as set forth therein.

(d) The Civilian Representative shall be required to familiarize himself or herself with the Revised Handschu Guidelines governing the investigation of political activity by the NYPD.

(e) If the Civilian Representative concludes that an investigation is being opened, extended, or conducted in viola-

tion of the Revised Handschu Guidelines, or that the NYPD is otherwise violating the Revised Handschu Guidelines, the Civilian Representative shall record his or her concerns regarding the purported violation and/or his or her objection to the investigation and the grounds for the objection in the minutes of the Handschu Committee meeting.

(f) If the Civilian Representative concludes that an investigation is being opened, extended, or conducted in violation of the Revised Handschu Guidelines, the Civilian Representative shall bring such investigation to the attention of the Police Commissioner. The Civilian Representative shall be provided with means to present his or her conclusion to the Police Commissioner directly (hereafter, "a VI(5)(f) communication"). The Police Commissioner shall inquire into the investigation and report the findings of the inquiry to the Civilian Representative within seven (7) days after receipt of the VI(5)(f) communication.

(g) If the Civilian Representative has concerns about the NYPD's compliance with the Revised Handschu Guidelines, and the Police Commissioner has not provided a timely response to the Civilian Representative's VI(5)(f) communication regarding such concerns, or the Civilian Representative is not satisfied with the Police Commissioner's response, the Civilian Representative may communicate those concerns to the Judge assigned to the Handschu case in the Southern District of New York at any time. In the event the Civilian Representative decides to communicate such concerns to the Court, a copy of the communication shall first be served confidentially upon the Police Commissioner, the Deputy Commissioner of Intelli-

gence, and the Deputy Commissioner of Legal Matters seven (7) days prior to its submission to the Court. The Civilian Representative shall retain final authority over and responsibility for the content of the communication. Submission to the Court shall be effectuated in compliance with Section VI(5)(k) below.

(h) After complying with provision VI(5)(f) hereof, if the Civilian Representative concludes at any time that the NYPD is systematically and repeatedly violating the Revised Handschu Guidelines to a degree sufficient to show a NYPD policy to act in such a fashion, the Civilian Representative shall report the alleged systematic violation to the Judge assigned to the Handschu case in the Southern District of New York. In the event the Civilian Representative decides to communicate such concerns to the Court, a copy of the communication shall first be served confidentially upon the Police Commissioner, the Deputy Commissioner of Intelligence, and the Deputy Commissioner of Legal Matters seven (7) days prior to its submission to the Court, provided that the Civilian Representative shall retain final authority over and responsibility for the content of the communication. Submission to the Court shall be effectuated in compliance with Section VI(5)(k) below.

(i) In addition, the Civilian Representative shall file an annual report with the Court related to his or her actions and observations as a member of the Handschu Committee. The annual report will (A) indicate whether the Civilian Representative has objected to any investigations over that period and the basis for that objection; (B) state whether the NYPD has (i) substantially obtained timely approval for extending and closing investigations, (ii) substantially obtained timely approval for the use of

human sources, and (iii) substantially fulfilled its obligation to review Preliminary Inquiries, Full Investigations, and Terrorism Enterprise Investigations every 6 months, as provided in sections V(B)(5), V(C)(4)(d) and V(D)(4)(d) hereof; and (C) address any communication during the annual period by the Civilian Representative to the Court under VI(5)(g) or (h). Prior to submission of the annual report to the Court, the Civilian Representative shall first serve copies confidentially to the Police Commissioner, Deputy Commissioner of Intelligence, and Deputy Commissioner of Legal Matters 21 days prior to submission to the Court, provided that the Civilian Representative shall retain final authority over and responsibility for the content of the report.

(j) The report and communications permitted under VI(5)(g), (h) and (i) will not include the number of investigations reviewed over the term, information deemed classified by the federal government, information obtained from other law enforcement or government agencies, information that reveals the identity of an individual or organization, information subject to the law enforcement privilege or other applicable privileges, or information that is otherwise protected by state or federal law.

(k) At the time that the Civilian Representative submits a communication or report to the Court pursuant to VI(5)(g), (h) or (i), notice of the Court's receipt of a communication or report from the Civilian Representative shall be entered on the Court's docket. The content of the communication or report to the Court shall, in the first instance, be maintained by the Court confidentially and under seal. The NYPD shall have 21 days from the filing of the communication or report to notify the Court (i) whether it contains privileged information or information that is prohibited from disclosure as set forth in VI(5)(j); (ii) if it believes such information can be protected through redaction of the document; or (iii) if it asserts the need to maintain the entire document confidentially and under seal. The Court shall adjudicate the propriety and scope of any such invocation. If the NYPD does not assert any such concerns about the information contained in the document, or if the Court determines that the document should be made public without redactions despite such objections by the NYPD, a copy of the report or communication shall be filed in the public docket and served on class counsel. If the Court determines that redactions can cure the need for the sealing of the entire document, a copy of the report or communication with the redactions shall be filed in the public docket and served on Class Counsel while the original submission by the Civilian Representative shall be maintained under seal. If the Court determines that the communication or report contains privileged information or information that is prohibited from disclosure as set forth in VI(5)(j) and that redaction cannot cure the need for the sealing of the entire document, the communication or report shall be maintained under seal and there shall be an entry on the Court's docket that the communication or report is being maintained under seal.

(6) Nothing herein shall effect, limit, or diminish the authorization and approval provisions for investigations, which grant exclusive approval authority to the Authorizing Officials or the Deputy Commissioner of Intelligence.

## VII. INVESTIGATIVE TECHNIQUES

(1) When conducting investigations under these guidelines, the NYPD may use any lawful investigative technique permitted by these guidelines. The choice of investigative techniques is a matter of judgment, which should take account of:

(i) the objectives of the investigation and available investigative resources;

(ii) the intrusiveness of a technique, considering such factors as the effect on the privacy of individuals and potential damage to reputation;

(iii) the potential effect on the political or religious activity of individuals, groups or organizations and the potential effect on persons who, although not a target of the investigation are affected by or subject to the technique;

(iv) the seriousness of the unlawful act; and

(v) the strength of the information indicating its existence or future commission of the unlawful act.

(2) Where the conduct of an investigation presents a choice between the use of more or less intrusive methods, the NYPD should consider whether the information could be obtained in a timely and effective way by the less intrusive means. The NYPD should not hesitate to use any lawful techniques consistent with these guidelines in an investigation, even if intrusive, where the intrusiveness is warranted in light of the seriousness of the crime or the strength of the information indicating its existence or future commission. This point is to be particularly observed in investigations relating to terrorist activities.

(3) Authorized methods in investigations include, among others, use of confidential informants, undercover activities and operations, eavesdropping and video surveillance (as defined in Article 700 of the NY Criminal Procedure Law), pen registers and trap and trace devices, consensual electronic monitoring, and searches and seizures.

a. Undercover Operations

(i) Undercover operations, including confidential informants, may be used when taking into account all the circumstances of the investigation, including the need for the information and the seriousness of the threat, it has been determined that the information sought in the investigation could not be reasonably obtained in a timely and effective way by a less intrusive means. The use of undercovers and confidential informants must be authorized by the Deputy Commissioner of the Intelligence Bureau prior to commencement of the undercover operation. The request to use undercovers or confidential informants and action taken on the request must be in writing and must include a description of the facts on which the investigation is based and the role of the undercover.

(ii) The use of an undercover or confidential informant will be approved for a period of 90 days and may be extended for additional periods of 90 days with the approval of the Deputy Commissioner of the Intelligence Bureau. Such extensions may be ap-

proved for as long as the investigation continues when it has been determined that the information sought in the investigation could not reasonably be obtained in a timely and effective manner by less intrusive means. The request to extend the use of undercovers and action taken on the request must be in writing and must include the reason for the extension.

(iii) Undercovers are strictly prohibited from engaging in any conduct the sole purpose of which is to disrupt the lawful exercise of political activity, from instigating unlawful acts or engaging in unlawful or unauthorized investigative activities.

b. Eavesdropping and Video Surveillance (as defined in Article 700 of the NY Criminal Procedure Law), Pen Registers and Trap and Trace Devices, and Consensual Electronic Monitoring

(i) All requirements for the use of such methods under the Constitution, applicable statutes, and NYPD regulations or policies must be observed.

(4) Whenever an individual is known to be represented by counsel in a particular matter, the NYPD shall follow applicable law and Department procedure concerning contact with represented individuals in the absence of prior notice to their counsel.

## VIII. DISSEMINATION AND MAINTENANCE OF INFORMATION

A. Dissemination

The NYPD may disseminate information obtained during the Checking of Leads, Preliminary Inquiries and investigations conducted pursuant to these guidelines to federal, state or local law enforcement agencies, or local criminal justice agencies when such information:

(i) falls within the investigative or protective jurisdiction or litigative responsibility of the agency;

(ii) may assist in preventing an unlawful act or the use of violence or any other conduct dangerous to human life;

(iii) is required to be disseminated by interagency agreement, statute, or other law.

B. Maintenance

All documentation required under these Guidelines shall be maintained by the Intelligence Bureau in accordance with general police department practice and applicable municipal record retention and destruction rules, regulations and procedures. Under these rules and practices documents are retained for no less than five years.

## IX. COUNTERTERRORISM ACTIVITIES AND OTHER AUTHORIZATIONS

In order to carry out its mission of preventing the commission of terrorist acts in or affecting the City of New York and the United States and its people, the NYPD must proactively draw on available sources of information to identify terrorist threats and activities. It cannot be content to wait for leads to come in through the actions of others, but rather must be vigilant in detecting terrorist activities to the full extent permitted by law, with an eye towards early intervention and prevention of acts of terrorism before they occur.

This Part accordingly identifies a number of authorized activities which further this end, and which can be carried out even in the absence of a checking of leads, Preliminary Inquiry, or Full Investigation as described in these guidelines. The authorizations include both activities that are specifically focused on terrorism and activities that are useful for law enforcement purposes in both terrorism and nonterrorism contexts. The authorized law enforcement activities of the NYPD include carrying out and retaining information resulting from the following activities.

## A. COUNTERTERRORISM ACTIVITIES

1. Information Systems

   The NYPD is authorized to operate and participate in identification, tracking, and information systems for the purpose of identifying and locating potential terrorists and supporters of terrorist activity, assessing and responding to terrorist risks and threats, or otherwise detecting, prosecuting, or preventing terrorist activities. Systems within the scope of this paragraph may draw on and retain pertinent information from any source permitted by law, including information derived from past or ongoing investigative activities; other information collected or provided by governmental entities, such as foreign intelligence information and lookout list information; publicly available information, whether obtained directly or through services or resources (whether nonprofit or commercial) that compile or analyze such information; and information voluntarily provided by private entities. Any such system operated by the NYPD shall be reviewed periodically for compliance with all applicable statutory provisions and Department regulations and policies.

2. Visiting Public Places and Events

   For the purpose of detecting or preventing terrorist activities, the NYPD is authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally. No information obtained from such visits shall be retained unless it relates to potential unlawful or terrorist activity.

## B. OTHER AUTHORIZATIONS

1. General Topical Research

   The NYPD is authorized to carry out general topical research, including conducting online searches and accessing online sites and forums as part of such research on the same terms and conditions as members of the public generally. "General topical research" under this paragraph means research concerning subject areas that are relevant for the purpose of facilitating or supporting the discharge of investigative responsibilities. It does not include online searches for information by individuals' names or other individual identifiers, except where such searches are incidental to topical research, such as searching to locate writings on a topic by searching under the names of authors who write on the topic, or searching by the name of a party to a case in conducting legal research.

2. Use of Online Resources Generally

For the purpose of developing intelligence information to detect or prevent terrorism or other unlawful activities, the NYPD is authorized to conduct online search activity and to access online sites and forums on the same terms and conditions as members of the public generally.

3. Reports and Assessments

The NYPD is authorized to prepare general reports and assessments concerning terrorism or other unlawful activities for purposes of strategic or operational planning or in support of other legitimate law enforcement activities.

## X. PROTECTION OF PRIVACY AND OTHER LIMITATIONS

A. General Limitations

The law enforcement activities authorized by this Part do not include maintaining files on individuals solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of any other rights secured by the Constitution or laws of the United States. Rather, all such law enforcement activities must have a valid law enforcement purpose and must be carried out in conformity with all applicable statutes and Department regulations and policies.

B. Construction of Part

This Part does not limit any activities authorized by or carried out under other Parts of these guidelines. The specification of authorized law enforcement activities under this Part is not exhaustive, and does not limit other authorized law enforcement activities of the NYPD.

## XI. RESERVATION

Nothing in these guidelines shall limit the general reviews or audits of papers, files, contracts, or other records in the possession of the NYPD or City of New York, or the performance of similar services at the specific request of another government agency. Such reviews, audits, or similar services must be for the purpose of detecting or preventing violations of law which are within the investigative responsibility of the NYPD.

Nothing in these guidelines is intended to limit the NYPD's responsibilities to investigate certain applicants and employees, or to pursue efforts to satisfy any other of its legal rights, privileges, or obligations. These guidelines are set forth solely for the purpose of internal NYPD guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural; enforceable at law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the NYPD or City of New York.